[Cite as *State v. Philpotts*, 2022-Ohio-2865.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 110607 |
| v. | : | |
| DELVONTE PHILPOTTS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 18, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-649537-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Thomas Rein; Cullen Sweeney, Cuyahoga County Public Defender, *for appellant.*

LISA B. FORBES, J.:

{¶ 1} Delvonte Philpotts ("Philpotts"), appeals his convictions and sentence following a bench trial. After reviewing the facts of the case and pertinent law, we affirm.

## I. Facts and Procedural History

{¶ 2} Martez Thomas ("Thomas") was shot and killed on September 4, 2018, after arriving at East 121st Street to sell an iPhone to Philpotts. Philpotts reached out to Thomas inquiring about buying an iPhone. When the two had agreed on a phone and a price, Philpotts gave Thomas the location of East 121st Street between Union Avenue and Kinsman Road to meet and complete the sale.

{¶ 3} Eyewitnesses to the shooting saw a silver Kia pull up to East 121st Street roughly 15-20 minutes before Thomas arrived. When Thomas pulled up in a red Chevrolet Cobalt ("the red Chevy"), someone from the silver Kia approached Thomas's car, speaking to Thomas through the passenger window. At the same time, Philpotts came around the corner and gunshots began ringing out. Once the shooting stopped, someone from the silver Kia took a bag from Thomas's red Chevy before driving off. Thomas lay dead in the street near the front driver's side of his red Chevy; Philpotts had a gunshot wound to the eye and was sitting on the ground near the back of Thomas's car, also on the driver's side.

{¶ 4} Philpotts was indicted in connection with Thomas's death as follows: Count 1 aggravated murder, an unclassified felony in violation of R.C. 2903.01(B); Count 2 aggravated robbery a felony of the first degree in violation of R.C. 2911.01(A)(3); Count 3 murder, an unclassified felony in violation of R.C. 2903.02(B); Count 4 felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(1); Count 5 involuntary manslaughter, a felony of the first degree in violation of R.C. 2903.04(A); and Count 6 discharge of a firearm on

or near prohibited premises, a felony of the first degree in violation of R.C. 2923.162(A)(3). Each count had a one-year firearm specification pursuant to R.C. 2941.141(A) and a three-year firearm specification pursuant to R.C. 2941.145(A).

{¶ 5} Following a bench trial, the trial court found Philpotts guilty on all counts. At sentencing, the court merged Counts 1, 3, 4, and 5 and the state requested sentencing on Count 1, aggravated murder. Further, the one- and three-year firearm specifications merged on all counts and the firearm specification in Count 6 merged with the firearm specification in Count 1. Philpotts was sentenced to life in prison with the eligibility for parole after 25 years on Count 1. On Count 2, Philpotts was sentenced to ten years in prison to be served concurrently to Count 1. On Count 6, Philpotts was sentenced to ten years in prison to be served concurrently to Count 1. Finally, the court sentenced Philpotts to a three-year firearm specification on Count 1 and a three-year firearm specification on Count 2, each was ordered to be served prior to and consecutive to the "base charge[.]"

## II. Witness Testimony at Trial

{¶ 6} The state called 17 witnesses and entered 275 exhibits into evidence, which resulted in the following pertinent testimony.

### A. Investigating Officers

{¶ 7} Responding officers recalled that on September 4, 2018, they were dispatched to East 121st Street ("the crime scene") to respond to a report of "two males shot outside a vehicle."

{¶ 8} When officers arrived on scene, they testified they believed both men were victims. The men were near a red car that was at "3466 East 121st Street" facing "[n]orthbound towards Kinsman, parked on the left side of the street." The red vehicle's door was open and there were "multiple shell casings" around it. No guns were recovered from the crime scene.

{¶ 9} One officer's body camera footage was played in court and admitted into evidence. The footage showed what the scene of East 121st Street looked like when he arrived. A still shot from his body camera footage was admitted into evidence. That photo shows the driver's side of Thomas's red Chevrolet. Thomas can be seen lying dead near the driver's side front tire. At the opposite end of the car a man the officer identified as Philpotts can be seen sitting on the ground with a towel wrapped around his head. Between the two men, the driver's door is open and the window is partially down with a defect to the glass. The officer testified that the defect to the window "appears to be damage caused by a bullet traveling through the window."

{¶ 10} The body camera footage captured a conversation between the officer and two individuals standing near the red Chevrolet who explained that "there was a silver car that was involved, and they believe that person is involved in the shooting and that they were shot as well." As a result, officers "broadcast over the radio" the information about the silver car and a possible suspect hit with gunfire. The officers learned that the suspect vehicle was a silver Kia.

{¶ 11} On September 5, 2018, an officer responded to a call for recovery of a "silver or * * * lighter gray Kia Forte." Testimony at trial revealed "[a]nother officer observed a vehicle with bullet holes in it and a resident decided to tell him more things about the vehicle not knowing who the vehicle belonged to. He then asked for assistance because radio ran the plate and [it] did not come back stolen but it is possibly wanted out of a homicide out of the Fourth District." The responding officer arrived at the location of the car to search for suspects and to maintain the scene around the vehicle. Once there, he observed "bullet holes on the vehicle. The back left taillight [sic] was broken out and then the plates came back out of state from Michigan."

### B. Eyewitness Testimony

{¶ 12} Lavonta Brown ("Brown") and Selvin Bonaparte ("Bonaparte") were eyewitnesses to the murder of Thomas.

{¶ 13} On September 4, 2018, Brown was sitting on a friend's porch when he noticed a silver Kia pull up on East 121st Street with approximately three, possibly four men inside. According to Brown, one of the passengers exited the silver Kia and "went to a field" that was "about ten feet" from where the car had parked. After "15 to 20 minutes" a red Chevy "pulled up" to the side of the silver Kia and the people inside "started talking for a second." Another passenger got out of the silver Kia "walk[ed] towards the red car[,]" and started talking to the person in the red Chevy. After approximately "four to five minutes," Brown recalled "that's when the gunshots went off." The shooting lasted "at least two to three minutes."

{¶ 14} Brown saw a passenger from the silver Kia "walk up to the red [Chevy] and take a bag * * *." The silver Kia then left the scene.

{¶ 15} Brown told police that there were two individuals in the silver Kia when it pulled up on East 121st Street, then two other individuals walked around the corner and got into the backseat. He further told police that there were two individuals in the red Chevy. Brown saw a man exit the passenger side of the silver Kia with a gun and shoot at the red Chevy before leaving the crime scene in the silver Kia. Brown did not see anyone from the red Chevy shoot back.

{¶ 16} Bonaparte recalled that on September 4, 2018, he was walking from Kinsman Road to Union Avenue when he noticed "a little red car parked on the right side of the street * * *." When he saw the red Chevy, there was a man kneeling down "on the passenger side of the car" talking to another man "sitting in the driver's seat* * *" communicating through the passenger side window of the car.

{¶ 17} When Bonaparte got to the driveway of his house on East 121st Street, "another young man [came] around the corner[.]" At that time, Bonaparte recalled hearing one of the men saying "don't do it, don't do it" before hearing gunshots. He recalled that after the gunshots, he saw "a guy laying by the red car and * * * another young man laying like a few feet from the car." When the second man eventually got up, Bonaparte recalled seeing his eye hanging out of his head. Bonaparte grabbed a towel to give to the man and called 911.

{¶ 18} Bonaparte testified that "the young man I was helping, that's the one I [saw] come around the corner."

## C. Kevin Fischbach

{¶ 19} Kevin Fischbach ("Officer Fischbach") is a homicide investigator for the Cleveland Police Department. As part of the investigation, a silver Kia Forte (the "silver Kia") and the red Chevy were towed and processed. Fischbach was present when both cars were processed. Officer Fischbach described the silver Kia as having tinted windows and "black rimmed" black wheels.

{¶ 20} During his investigation, Officer Fischbach obtained video footage from a security camera at Betty Vaughn's house on East 121st Street (the "Vaughn video").[1] The Vaughn video was played in court. According to Officer Fischbach, the "vantage point" from the Vaughn video looks down East 121st Street towards Union Avenue. At 11 seconds, the Vaughn video shows a silver car with tinted windows, black wheels with black rims driving towards Kinsman Road before exiting the camera's field of view. At 2 minutes and 37 seconds, the Vaughn video shows two Cleveland police vehicles with their lights flashing driving towards the location of the shooting.

{¶ 21} As part of his investigation, Officer Fischbach also obtained video from Southpointe Hospital (the "Southpointe video") because "[i]t was the nearest hospital that if somebody was injured they would go to." According to Officer Fischbach, it was "[p]robably five to ten minutes, from 121st Street."

---

[1] Betty Vaughn testified in court and identified the Vaughn video as the video taken from the security cameras on her house.

{¶ 22} The Southpointe video shows "a silver Kia Forte with blacked out tires and tinted windows" pull up to the entrance of Southpointe Hospital. That silver Kia Forte had a "fin" that is similar to a "fin" on the silver Kia processed by Cleveland police. At 16 seconds, the Southpointe video shows a person getting out of the rear passenger side of a silver Kia and "limping, skipping" into the hospital. According to Officer Fischbach, that person was later identified as Walther Jackson ("Jackson"). It was apparent to Officer Fischbach from the video that Jackson had an injury to his left leg because he was "hobbling, he [was] holding his left arm in a still position while moving his right to gain forward momentum."

{¶ 23} The Southpointe video shows the silver Kia arrive at 7:13 p.m. Officer Fischbach opined that Jackson would "[a]bsolutely" have had enough time to travel from the crime scene to Southpointe Hospital in the time between when shots were fired, as indicated by a 911 call received at 7:06 p.m., and 7:13 p.m., when they arrive at Southpointe Hospital.

{¶ 24} As part of his investigation, Officer Fischbach obtained Jackson's medical records. He learned that Jackson had suffered three gunshot wounds and did not give his real name to the hospital.

{¶ 25} Officer Fischbach testified that Jackson was arrested at the hospital in connection with Thomas's murder, but charges were later dismissed.

{¶ 26} Officer Fischbach offered his opinion that the silver Kia processed by the police department was "[a]bsolutely" similar to the silver Kia seen in the Vaughn video. When processing the silver Kia, Officer Fischbach stated that swabs were

taken from inside the vehicle. When Officer Fischbach examined the silver Kia, he saw several "defects to the driver's side door." Asked what those defects signified to him, Officer Fischbach responded "[b]ullet holes." Officer Fischbach did not see any bullet holes on the passenger side of the silver Kia.

{¶ 27} Regarding the processing of the red Chevy, Officer Fischbach claimed the driver's window was "partially up" and had a defect "about midline right at the edge of the glass line." In Fischbach's opinion, this defect was caused by "[a] fired bullet." Fischbach was shown a photo of a responding officer's body camera footage, which shows Thomas laying on the ground near the front driver's side of the red Chevy and Philpotts sitting near the back tire with the driver's door open between them. According the Officer Fischbach, based on that photo, the bullet "would have to come from outside the vehicle and towards the door instead of from inside the door away from the vehicle." That bullet could have been fired towards where Philpotts was found according to Officer Fischbach. Further, on the inside of the door with the bullet defect in the window, there was apparent blood splatter that was swabbed for DNA testing.

{¶ 28} At the time the red Chevy was processed, Officer Fischbach considered Philpotts as a victim. During his investigation, Officer Fischbach's opinion that Philpotts was a victim changed. He explained:

> Throughout the investigation you are always evaluating the evidence, the crime scene photos, information you're receiving from the medical examiner's office, discussions with your partner and the fact that Mr. Philpotts was friends with Walter Jackson, the man who we had originally arrested for this incident, that he was not with Mr. Martez

Thomas and the evaluation of the text messages received from Mr. Thomas'[s] phone, it was apparent that Mr. Thomas was arriving on scene to conduct business with Mr. Philpotts.

{¶ 29} Officer Fischbach stated that Thomas's mother provided police with an empty gun box that belonged to her son. According to Officer Fischbach, this indicated that Thomas owned a gun. Thomas's gun was not found at the crime scene.

{¶ 30} Based on the empty gun box, Officer Fischbach testified that Thomas's gun was "a Glock G27 which is a 40 caliber Glock." Specifically, a Glock G27 GEN 4. Officer Fischbach was shown a description of the Glock G27 GEN 4 from the Glock website that was admitted into evidence. Based on that description, Officer Fischbach stated the weapon used 40 Smith & Wesson caliber bullets. Officer Fischbach was familiar with Glock handguns because that "is the same manufacturer as what the Cleveland Police Department issues * * *."

{¶ 31} Inside the Glock gun box that Thomas's mother gave to police were "some cleaning tools," "some extra grips for the handle," "a speed loader," and "an extra magazine * * * with * * * one 40 caliber [hollow point] round in it."

{¶ 32} As part of his investigation, Fischbach collected Thomas's Apple watch, which was connected to his iPhone. Officer Fischbach testified regarding photos he took of text messages found on Thomas's Apple watch between Thomas and 216-776-**** ("776"). Those messages were as follows:

776: Bro this Yelz my brudda said you got another phone

776: Or some shoes for sale

Thomas:  What size an I can get another

776:  9 1/2-11

Thomas:  Oh Nawl ain't got that size

776:  Ight

776:  His goofy a** need a I phone doe if you come up on one lemme kno

Thomas:  Alright bet

Thomas sends a photo of an iPhone

Thomas:  $120

776:  You can come bring it later?

Thomas:  Meet me

776:  Where

Thomas:  On kinsman

776:  What part

Thomas:  116 I'm go be at the store

776:  Oh you gone be at da parade?

Thomas:  Yeah

776:  I'm stuck outhea rn TIL my sister get off work I'll hit you up doe she get of like 4

Thomas:  Alright bet

Thomas:  Wya

776:  Just woke up bouta hit da hood wya

Thomas:  116

776:  You still at da sto?

Thomas:  I'm coming up I gotta go get the phone

776:  You gone hit me up when you come back down?

Thomas:  Yeah

776:  Ight I'll be around be safe

Thomas:  Alright bruh you too

776:  He said you tryna just link tm?

Thomas:  Alright bet

776:  Fasho

Thomas:  Aye bruh you know somebody who tryna buy a 6s+

776:  Sh*t he said he a buy dat if you got it

Thomas:  I got it

776:  How much

Thomas:  $210 it a 6s+

776:  He got it

Thomas:  Wya

776:  Lee rd near hvd on sorrento

Thomas:  Bet

Thomas:  Let me know when you ready

776 sent his location to Thomas of "East 121st Street between Union and Kinsman."

Thomas:  On my way

776:  Bet

Thomas:  Outside

{¶ 33} Officer Fischbach obtained the cell phone records for the 776-phone number, which revealed that it was "a TracFone Wireless." Officer Fischbach stated that he encountered TracFones "all the time" in prior cases and stated that "they don't give an owner's name." Similarly, the 776 phone records did not have a name associated with them. The 776 phone records confirmed communication between the 776 number and Thomas.

### D. The Recovered Casings and Bullets

#### 1. Michael Hale

{¶ 34} Michael Hale ("Detective Hale") works for the Cleveland Division of Police Crime Scene Unit. Detective Hale testified regarding the crime scene photos he took when he arrived on scene, which were introduced into evidence at trial. Those photos showed Thomas's red Chevy, spent cartridge casings scattered on the street around the red Chevy, spent cartridge casings in the driveway of the house that Thomas's car was parked in front of, blood stains on the street on the driver's side of Thomas's car, and a blood spot on the ground near Thomas's car, among other things.

{¶ 35} According to Detective Hale, five cartridge casings found near the red Chevy and at the end of the driveway of 3466 East 121st Street were "40 Smith & Wesson[.]" Cartridge casings found further up the driveway of 3466 East 121st Street were "380 Auto Winchester 380[.]"

## 2. Andrea McCollom

{¶ 36} Andrea McCollom ("McCollom") is a deputy medical examiner for the Cuyahoga County Medical Examiner's Office. McCollom performed an autopsy on Thomas and created an autopsy report dated November 16, 2018, which was admitted into evidence.

{¶ 37} Thomas's autopsy revealed that he had "a gunshot wound to the chest." The bullet trajectory inside Thomas's body went "from front to back and downward."

{¶ 38} When examining the gunshot wound on Thomas's chest, McCollom did not find any fouling or stippling. McCollom described fouling as "smoke that comes out of the end of a gun" that can be deposited onto the skin. Further, she described "stippling" as "abrasions caused by unburnt gunpowder that comes and strikes the skin and leaves an abrasion."

{¶ 39} According to McCollom, the absences of fouling and stippling "can mean that the muzzle of the gun was so far away from the skin that it didn't leave any of those things. In a handgun, that's approximately three feet depending on the gun. Or it means there was an intervening target that [fouling and stippling] could be deposited on. Most commonly the target is clothing."

{¶ 40} Asked how long Thomas would have had motor functions and the ability to move after he was shot, McCollom responded "seconds to minutes, just depends on how bad the injury to the spinal cord was. I didn't see any injury to the spinal cord. There was some hemorrhage around it. * * * But the injury to the heart,

unless you're right in the emergency room, that's going to cause death after a number of minutes."

{¶ 41} In addition to the gunshot wound, Thomas "had a laceration to his right eyebrow" that went "all the way down to the bone and soft tissues." This laceration "did not look like a graze gunshot wound," rather, McCollom thought "[i]t looked more like a laceration from a blunt impact." However, there was no way for her to tell what would have impacted Thomas's head to cause it.

{¶ 42} McCollom determined that Thomas's cause of death was a "[g]unshot wound to the chest with vascular, visceral and skeletal injuries." Further, his manner of death was "[h]omicide."

### 3. James E. Kooser

{¶ 43} James E. Kooser ("Kooser"), a forensic scientist two for the Cuyahoga County Regional Forensic Science Laboratory, testified "as an expert in the area of firearms and toolmarks examination."

{¶ 44} Kooser explained the process used to examine a "spent case" and "spent bullet" recovered from a crime scene. As part of that process, Kooser testified that he can examine the "individual characteristics" of the case and bullet to "help identify cartridge case to another cartridge case, cartridge case to a firearm or eliminate them." Further, he can compare the "rifling patterns" left on fired bullets to compare to other bullets or the "markings that are individual to the firearm." However, he cannot test whether a spent bullet came from a particular spent

cartridge case. According to Kooser, a firearm is not needed to do these examinations.

{¶ 45} Kooser preformed ballistic testing for this case and issued a report of his analysis as part of the normal course of his duties, which was admitted into evidence. Kooser's report detailed numerous items. Item 16 was "a projectile bullet from [the] back" of Thomas (the "autopsy bullet") received from the medical examiner's office. The autopsy bullet was "one fired copper jacket lead flat nose bullet." According to Kooser, the autopsy bullet was "consistent with 380 Auto caliber ammunition."

{¶ 46} Item 25 was a "bullet fragment from the head of D. Philpotts" (the "hospital bullet"). In his report, Kooser described the "hospital bullet" as "one fired copper jacket lead hollow point bullet." Based upon the "2016 FBI * * * General Rifling Characteristics," Kooser determined that the hospital bullet "is consistent with ammunitions fired from a 40 caliber firearm manufactured by Bersa, Glock, Heckler & Koch, IMI, Kahr Arms, Vektor, or a 10 millimeter Auto manufactured by Glock."

{¶ 47} Kooser explained the difference between the .40-caliber "hospital bullet" recovered from Philpotts's head and the autopsy bullet pulled from Thomas's back. "[T]he hospital bullet was a hollow point and the fins are bent whereas the 380 bullet is a solid nose, flat nose type bullet; and if they were compared next to each other, you would see one is much larger than the other." Kooser concluded that

there was no chance the autopsy bullet and the hospital bullet were fired from the same gun.

{¶ 48} As part of his examination, Kooser also analyzed "spent cases" from the crime scene. He received "five fired Winchester 380 Auto caliber cartridge cases" and "five fired SIG 40 Smith & Wesson caliber cartridge cases" to examine. Kooser explained that Winchester and SIG Sauer are the manufacturers of the ammunition. Kooser explained that "40 Smith & Wesson is the actual caliber of the weapon."

{¶ 49} During his examination, Kooser compared the five .380-cartridge cases and determined that they were fired by the same firearm. Further, as it pertains to the .40-caliber cartridge cases, "the five fired 40 Smith & Wesson caliber cartridge cases * * * were fired by the same unknown Glock 40 caliber pistol." Kooser was able to identify the .40-caliber cartridge cases as having been fired from a Glock "[b]ased on the firing cycling mark characteristics that are left on it. The Glock has a very distinctive firing pin impression * * *."

{¶ 50} Kooser stated that both .40-caliber and .380-caliber ammunition and weapons are "common." In distinguishing between the two, Kooser stated "40 caliber is quite a bit larger than a 380." Further, a .40-caliber round could not be fired from a .380-caliber pistol.

{¶ 51} No weapons were submitted to Kooser for testing in this case.

### E. Trace Evidence

#### 1. Curtis Jones

{¶ 52} Curtis Jones ("Jones") is the supervisor of the trace evidence unit at the Cuyahoga County Medical Examiner's Office and testified as a trace evidence examination expert. Jones conducted a trace evidence examination in this case. As part of his examination, Jones prepared two reports that were admitted into evidence.

{¶ 53} Jones's first report was dated April 9, 2020. Based on the first report, Jones testified that he ran a chemical test on Thomas's hands that resulted in "no reaction observed for trace metal on hands of the decedent." According to Jones, "a negative reaction to [the trace metal] test is not conclusive for anything. The real value of that test is when there is a positive reaction that forms a pattern that can then be associated to an item like the exposed metal surfaces of an object like the handle of a knife or pipe or some metal object."

{¶ 54} Further, Jones examined Thomas's clothing for bloodstaining and other trace evidence, such as hairs. After conducting his examination, Jones did not find any "foreign source" for the blood on Thomas's shirt.

{¶ 55} Jones prepared the second report on April 2, 2021. In that report, Jones concluded that "gunshot primer residue was located on" samples collected from Thomas's hands.

{¶ 56} Jones explained that if gunshot primer residue is found on a sample, the conclusions that can be reached are that: the individual fired a firearm; an

individual was in close proximity to the discharge of the firearm; or "an individual handled or touched some surface that had gunshot primer residue on it * * *."

{¶ 57} Jones clarified that while gunshot reside primer was "located on the sample collected" from Thomas, there was no way to tell exactly which of these three possibilities caused the gunshot primer residue to be deposited onto his hands, nor is there a way to determine when it was deposited.

### 2. Lisa Moore

{¶ 58} Lisa Moore ("Moore") is a forensic scientist in the DNA department for the Cuyahoga County Medical Examiner's Office. For this case, Moore created five reports.

{¶ 59} Moore's first report concluded that "the DNA profile obtained from [the swab of Thomas's right-hand fingernails]" was a mixture with "DNA foreign to Martez Thomas" that was "inconclusive due to insufficient information." Moore clarified that it meant another person's DNA was present; however, it was "not enough to make a comparison."

{¶ 60} In the second report, Moore tested the swabs of the "driver's interior door handle of the Chevy Cobalt." Moore found "a mixture" DNA profile. "[A] match was identified * * * that was seven point 46,000 times more probable than a coincidental match to an unrelated African-American person * * * between those swabs and Thomas."

{¶ 61} In her third report, Moore compared the samples from the silver Kia and red Chevy to a "reference sample" provided by Philpotts. She found "there was no support for a match" between the swabs from the silver Kia and Philpotts.

{¶ 62} Further, the pool of blood by the back passenger wheel of Thomas's red Chevy was tested and concluded a match was identified between Philpotts and the pool of blood.

{¶ 63} Similarly, the "swabs [of] suspected blood [on the] driver's interior door panel" of the red Chevrolet matched Philpotts; that match was "81.4 decillion times more probable than a coincidental match to an unrelated African-American person * * *." Additionally, the swabs of "touch DNA driver's interior door handle" of the red Chevrolet also matched Philpotts, and that match was "81.1 octillion times more probable than a coincidental match to an unrelated African-American person * * *." Thus, based on the testing, Moore stated that the mixed touch DNA from the driver's interior door matched both Thomas and Philpotts. But according to Moore, "[t]he major contribution is * * * Philpotts."

{¶ 64} In the fourth and fifth reports, Moore compared Jackson's DNA profile to previously tested items. Through that testing, Moore concluded that Jackson's DNA was not located on any of the swabs from the silver Kia or the red Chevy.

### F. Additional Evidence

#### 1. Thomas's Mother

{¶ 65} Danielle-Aikens Williams ("Aikens-Williams") testified that she is Thomas's mother. At the time of his death, Thomas lived with her.

{¶ 66} Prior to his death, Thomas worked in security and planned to start the police academy. Thomas owned a gun and had a concealed-carry permit. He obtained the gun and his concealed-carry permit "for safety purposes and also because he was pursuing a career in law." Aikens-Williams testified that Thomas kept his gun in "a locked case with a key." However, Thomas would take his gun with him when he drove to work.

{¶ 67} Some of Thomas's hobbies included going "to the gun range weekly. He worked out. He watched YouTube all the time on training how to disarm, clean, take apart all his firearms that he had." Thomas also bought and sold things on the internet including refurbished cell phones. "He would take them apart and fix them and put them back together and put them up for sale." Aikens-Williams knew that Thomas sold cell phones but was unaware to whom he sold them.

{¶ 68} Aikens-Williams was familiar with Thomas's friends and claimed that he was not friends with Philpotts or Jackson.

{¶ 69} At the time of his death, Thomas drove a red "Chevy."

{¶ 70} On September 4, 2018, Aikens-Williams recalled that Thomas left home to go to work at "exactly 6 o'clock" p.m. Aikens-Williams was "sure" Thomas took his gun with him that evening and claimed that she had never saw the gun again

after his death. Aikens-Williams "knew" that Thomas had to be at work at 6 o'clock, so she asked him why he was going to work late. "He said he had to stop somewhere first, and he already told — called his job and told them he would be there at 7." Aikens-Williams did not know where Thomas had to go before work.

{¶ 71} Thomas had a cell phone and Apple watch that he used together. Aikens-Williams had seen him use his Apple watch to receive text messages. Aikens-Williams saw text messages on Thomas's Apple watch about him going to sell a phone and decided to give the watch to the police. After Thomas's death, Aikens-Williams also provided police with a gun box "that his firearm came in," which had a magazine with a bullet inside of it.

### G. Thomas's Sister

{¶ 72} Tyielle Harvey ("Harvey") testified that she is Thomas's sister. Before his death, Thomas drove "a red two door Cobalt."

{¶ 73} Harvey claimed that she was aware of "[a]ll" of Thomas's friends and that he was "[a]bsolutely not" friends with Philpotts or Jackson.

{¶ 74} Harvey testified that in 2018, Thomas "had many" guns. She stated he liked guns and "went to the gun range" regularly, which made him proficient in using them.

{¶ 75} Harvey claimed that Thomas would "buy Apple products, Apple watches, air pods and * * * he would resell them * * *." Harvey stated that Thomas typically sold Apple products to "people close to [them], more so family and close

friends, not necessarily strangers." However, she did state that she did not know all of Thomas's Apple-product customers.

{¶ 76} Harvey sent a screenshot of "[t]he Cleveland remembrance page[']s" post about Jackson's death to the prosecutor because she had heard Jackson's name "in the streets." Additionally, Harvey sent Jackson's Instagram page, which showed photos of Jackson and Philpotts together.

### H. Philpotts's Sister

{¶ 77} Ashley Brooks ("Brooks") is Philpotts's sister. According to Brooks, Philpotts goes by the nickname "Yelz."

{¶ 78} On the morning of September 4, 2018, Philpotts, Jackson, and Brooks watched movies together at her aunt's house. Brooks recalled that she was with Philpotts "all day" until she dropped him off "between 5, 6 p.m." at "119th and Kinsman." When Brooks left with Philpotts to drop him off, Jackson stayed at her aunt's house. Brooks was unaware of where Philpotts or Jackson were between 6 p.m. and 7 p.m. that evening.

{¶ 79} According to Brooks, Jackson "was arrested for shooting my brother and killing another."

{¶ 80} Brooks was shown surveillance footage from Southpointe Hospital. She identified Jackson as the man exiting "the passenger back" door of the silver Kia and entering the hospital.

**{¶ 81}** Brooks claimed that she was friends with Jackson and that Philpotts and Jackson "were good friends." Brooks claimed that in 2018, Philpotts and Jackson hung out "[m]ore than twice a week."

**{¶ 82}** After Jackson died in October 2020, Brooks talked to Philpotts about his death. She recalled that Philpotts took Jackson's death hard and "was sad, * * * there was a lot of mixed emotions that day."

**{¶ 83}** Brooks identified a screenshot of Jackson's Instagram account. On his Instagram account, Jackson posted photos of himself together with Philpotts. Brooks confirmed one photo had been taken after September 4, 2018, because Philpotts can be seen with the injury to his eye that resulted from the shooting.

## III. Law and Analysis

**{¶ 84}** On appeal, Philpotts raises the following four assignments of error:

> The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(a), on the charges, and thereafter entering a judgment of conviction of the offense as those charges were not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

> Appellant's convictions are against the manifest weight of the evidence.

> The trial court erred by ordering convictions and a separate sentence for separate counts because the trial court failed to make a proper determination as to whether those offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transaction under R.C. 2929.14.

> The trial court erred by ordering convictions and a separate sentence for separate firearm specifications because the trial court failed to make a proper determination as to whether those offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transaction under R.C. 2929.14.

## A. Sufficiency of the Evidence

{¶ 85} Under his first assignment of error, Philpotts argues that the state did not present sufficient evidence to sustain any of his convictions and accordingly, the trial court erred when it denied his Crim.R. 29 motion for acquittal.

{¶ 86} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 87} "Circumstantial and direct evidence are of equal evidentiary value." *Cleveland v. Turner*, 2019-Ohio-3378, 132 N.E.3d 766, ¶ 35 (8th Dist.), *discretionary appeal not accepted*, 157 Ohio St.3d 1512, 2019-Ohio-5193, 136 N.E.3d 510, ¶ 35, citing *State v. Santiago,* 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12. A "conviction can be sustained based on circumstantial evidence alone." *State v. Franklin,* 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely,* 39 Ohio St.3d 147, 154-155, 529 N.E.2d 1236 (1988).

### 1. Philpotts's Convictions

#### a. Aggravated Murder

{¶ 88} Pursuant to R.C. 2903.01(B), "No person shall purposely cause the death of another * * * while committing or attempting to commit, * * * aggravated robbery, * * *."

#### b. Aggravated Robbery

{¶ 89} Pursuant to R.C. 2911.01(A)(3), "No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, or attempt to inflict, serious physical harm on another."

#### c. Murder

{¶ 90} Pursuant to R.C. 2903.02(B), "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."  R.C. 2901.01(9)(a) defines aggravated robbery as an offense of violence.

#### d. Felonious Assault

{¶ 91} Pursuant to R.C. 2903.11(A)(1), "No person shall knowingly * * * [c]ause serious physical harm to another[.]"

### e. Involuntary Manslaughter

{¶ 92} Pursuant to R.C. 2903.04(A), "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony."

### f. Discharge of a Firearm on or near Prohibited Premises

{¶ 93} Pursuant to R.C. 2923.162(A)(3), "No person shall * * * [d]ischarge a firearm upon or over a public road or highway."

### g. Firearm Specifications

{¶ 94} Pursuant to R.C. 2941.141(A), an offender is subject to a one-year firearm specification if "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense."

{¶ 95} Pursuant to R.C. 2941.145(A), an offender is subject to a three-year firearm specification if "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and * * * used [the firearm] to facilitate the offense."

### 2. Analysis

{¶ 96} It is undisputed that Thomas died on East 121st Street from gunshot wounds on September 4, 2018. It is undisputed that two guns were fired on East 121st Street on September 4, 2018. It is undisputed that Philpotts was at the scene of the crime on September 4, 2018. Furthermore, it is undisputed that Thomas arrived at East 121st Street on September 4, 2018, because that is where Philpotts, known as Yelz, instructed Thomas to go.

{¶ 97} Testimony showed that a silver Kia arrived at the crime scene, 15 to 20 minutes before Thomas arrived. Eyewitnesses testified that someone exited the silver Kia and spoke to Thomas through the passenger window of Thomas's red Chevy. Eyewitnesses further testified that at the same time, Philpotts walked around the corner towards the red Chevy, someone yelled "don't do it, don't do it," and gunshots were fired. Eyewitnesses further testified that someone from the silver Kia grabbed a bag from Thomas's red Chevy before fleeing the crime scene in the silver Kia.

{¶ 98} Touch DNA evidence presented at trial taken from the driver's interior door handle of the red Chevrolet was consistent with Philpotts's DNA. Further, the only blood found inside the red Chevrolet was Philpotts's blood.

{¶ 99}The evidence demonstrated that the bullet that killed Thomas was shot from a .380-caliber firearm. The evidence further showed that the bullet retrieved from Philpotts's eye was shot from a .40-caliber Glock. Evidence presented demonstrated that the same firearm could not have shot both the .380-caliber and the .40-caliber bullets. No guns were found at the crime scene, no guns were recovered in relation to this case, and Philpotts's hands were never tested for gunshot residue.

{¶ 100} The crux of this case lies in the complicity statute. Under Ohio's complicity statute, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). A defendant guilty of complicity "shall be prosecuted

and punished as if he were a principal offender. A charge of complicity may be stated * * * in terms of the principal offense." R.C. 2923.03(F).

> "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime."

*State v. Sutton*, 8th Dist. Cuyahoga Nos. 102300 and 102302, 2015-Ohio-4074, ¶ 33, quoting *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus.

{¶ 101}Upon review, we find that the state produced sufficient evidence to support all of Philpotts's convictions. His arguments that there was no evidence that he intended to kill Thomas nor that he fired a gun are not well taken.

{¶ 102} Evidence presented at trial demonstrated that Philpotts lured Thomas to come to the crime scene under the guise of buying an iPhone. The silver Kia was waiting for Thomas. Philpotts was not in the silver Kia. Instead, Philpotts appeared on the other side of Thomas's car — the driver's side. Philpotts reached inside the car, leaving behind his DNA. Someone shot and killed Thomas with a .380-caliber bullet. Someone from the silver Kia grabbed a bag from Thomas's car and fled. The state presented evidence that Philpotts spent the day with Jackson prior to Thomas's death and that the two remained close friends afterwards. Further, evidence presented at trial demonstrated that Jackson was in the silver Kia along with a few other men that arrived at the crime scene before Thomas arrived

and fled in the silver Kia after the shooting to Southpointe Hospital to be treated for gunshot wounds.

{¶ 103} This district has held that "[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *State v. Hubbard*, 8th Dist. Cuyahoga No. 83389, 2004-Ohio-5204, ¶ 40, citing *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). Accordingly, the court could infer that, based on Philpotts's conduct, Philpotts shared Jackson's criminal intent and the criminal intents of the other individuals in the silver Kia. *See State v. Johnson*, 8th Dist. Cuyahoga No. 106141, 2018-Ohio-4023, ¶ 14 (finding the state presented sufficient evidence to sustain a conviction of aggravated murder against a defendant who aided and abetted the principal offenders when she "set the sequence of events into motion" by luring the victim to the location where he was murdered). Philpotts's convictions are supported by sufficient evidence in the record and his first assignment of error is overruled.

### B. Manifest Weight

{¶ 104} A challenge to the manifest weight of the evidence "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins*,

78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 105} The weight of the evidence presented can lead a reasonable factfinder to conclude that Philpotts and Jackson were working together to rob Thomas. Minutes after the shooting occurred at the crime scene, Jackson arrived at Southpointe Hospital in a silver Kia matching the description of a silver Kia at the crime scene to be treated for gunshot wounds. This same silver Kia matched a silver Kia that was caught on the Vaughn video speeding away from the crime scene. Further, eyewitness testimony showed that someone exited from the silver Kia, took a bag from the red Chevy, and Thomas's gun was not found at the crime scene.

{¶ 106} Testimony further established that Philpotts and Jackson spent the day together on September 4, 2018. Philpotts was shot in the eye that day at the crime scene. Philpotts remained good friends with Jackson after the crime and he took the news of Jackson's subsequent death hard.

{¶ 107} As the court noted when finding Philpotts guilty, "If Jackson conceived a great idea to turn a street sale into a lick without prior consultation with Mr. Philpotts, if they were not working together the Court cannot concede that the friendship would have continued." In rendering its verdict, the court explained that "two theories that [came] to mind given all the foregoing testimony evidence * * *.

That [Philpotts and Thomas] were set up by individuals acting without knowledge of [Philpotts and Thomas] or alternatively that [Philpotts] was acting in conjunction with other actors."

{¶ 108}This is not a case where the trier of fact ignored other possible explanations for the crime that occurred. Rather, this is a case where the trier of fact heard testimony and made a credibility determination regarding the testimony presented. Therefore, this is not "the exceptional case in which the evidence weighs heavily against the conviction." *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶ 109} The evidence showed that Philpotts lured Thomas to the crime scene and a "conviction can be sustained based on circumstantial evidence alone." *Franklin*, 62 Ohio St.3d at 124, 580 N.E.2d 1, citing *Nicely*, 39 Ohio St.3d at 154-155, 529 N.E.2d 1236. Here, the weight of the circumstantial evidence presented was enough to allow the trier of fact to conclude that Philpotts was an active participant in the murder and robbery of Thomas.

{¶ 110} Accordingly, we find that the Philpotts's convictions are not against the manifest weight of the evidence. Philpotts's second assignment of error is overruled.

### C. Allied Offenses

{¶ 111} For ease of discussion, Philpotts's third and fourth assignments of error will be discussed together.

{¶ 112} In his final two assignments of error, Philpotts argues that the trial court erred when it did not merge Counts 1 and 2 because "the transaction and

incident here was only one homicide" that should have been merged for sentencing because that death occurred "during the commission of an Aggravated Robbery." We disagree.

{¶ 113} Appellate courts review de novo whether two offenses are allied offenses of similar import. *State v. Boczek*, 8th Dist. Cuyahoga No. 103811, 2016-Ohio-5708, ¶ 4.

{¶ 114} R.C. 2941.25(A) states, "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However, the Ohio Supreme Court has held that "[a]ggravated murder, as defined in R.C. 2903.01, is not an allied offense of similar import to aggravated robbery, as defined in R.C. 2911.01, for purposes of R.C. 2941.25(A)." *State v. Bickerstaff*, 10 Ohio St.3d 62, 461 N.E.2d 892 (1984). *See also State v. Nields*, 93 Ohio St.3d 6, 31, 752 N.E.2d 859 (2001) (rejecting a defendant's double jeopardy argument because "aggravated robbery and aggravated murder based on the robbery are separate offenses").

{¶ 115} In *State v. Hughley*, 8th Dist. Cuyahoga No. 108771, 2020-Ohio-4741, this court recently followed the Supreme Court's holding in *Bickerstaff*. Similar to Philpotts, Hughley was convicted of and sentenced to aggravated murder in violation of R.C. 2903.01(B) and aggravated robbery in violation of R.C. 2911.01(A)(3). *Id.* at ¶ 14.

{¶ 116}Based upon the holdings of the Supreme Court in *Bickerstaff* and this court in *Hughley*, we cannot say that the trial court erred when it sentenced Philpotts for both aggravated murder and aggravated robbery because they are not allied offenses.

{¶ 117}Turning to Philpotts's second merger issue, according to Philpotts, the trial court erred when it sentenced him to firearm specifications for both Counts 1 and 2. We disagree.

{¶ 118} R.C. 2929.14(B)(1)(g) states:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are *aggravated murder*, murder, attempted aggravated murder, attempted murder, *aggravated robbery*, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court *shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted* or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

(Emphasis added.)

{¶ 119} Here, Philpotts was convicted of both aggravated murder and aggravated robbery. Each of those convictions had a one-year and a three-year firearm specification attached to them. Therefore, according to R.C. 2929.14(B)(1)(g), the trial court was required to sentence Philpotts to serve both of the three-year firearm specifications. This court has previously found that R.C. 2929.14(B)(1)(g) requires trial courts to impose multiple firearm specifications

for a single incident. *See Hughley*, 8th Dist. Cuyahoga No. 108771, 2020-Ohio-4741, at ¶ 65 (finding no error when the trial court sentenced a defendant to two firearm specifications when the defendant was convicted of aggravated robbery and aggravated burglary).

{¶ 120} Having found that the trial court did not err when it sentenced Philpotts on both his aggravated murder and aggravated robbery convictions and when it imposed two three-year firearm specifications, Philpotts's third and fourth assignments of error are overruled.

{¶ 121} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
EILEEN A. GALLAGHER, J., CONCUR