[Cite as *State v. McQuisition*, 2024-Ohio-3011.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

    v. :

No. 113254

RICHARD MCQUISITION, :

    Defendant-Appellant. :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 8, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-676442-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carla Neuhauser, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and John T. Martin, Assistant Public Defender, *for appellant.*

LISA B. FORBES, P.J.:

{¶ 1} Richard McQuistion ("McQuistion") appeals his convictions for rape and domestic violence. After reviewing the facts of the case and pertinent law, we affirm the trial court's decision.

## I. Facts and Procedural History

{¶ 2} On November 22, 2022, McQuistion and his former girlfriend, V.B., went to the leasing office of the apartment complex in which they used to live to pay rent for the apartment they shared prior to breaking up. After McQuistion paid the rent, V.B. walked back to the apartment and McQuistion followed her. McQuistion pushed his way into the apartment, hit V.B. in the face and head, and raped her.

{¶ 3} On December 6, 2022, McQuistion was indicted for forcible rape and felony-domestic violence, with a furthermore clause stating that McQuistion had a previous domestic-violence conviction. This case was tried to the bench. After the State presented its case in chief, McQuistion's attorney moved for a Crim.R. 29 acquittal on both counts, and the court denied this motion. McQuistion moved for acquittal on both counts again after the close of his case in chief. The court granted the Crim.R. 29 motion for acquittal only on the "furthermore clause in the domestic violence," finding that the State failed to present a certified copy of the journal entry of McQuistion's previous domestic violence conviction.

{¶ 4} On August 23, 2023, the court found McQuistion guilty of forcible rape and misdemeanor domestic violence, having previously acquitted McQuistion of the furthermore clause. The court sentenced McQuistion to an aggregate term of three to four-and-a-half years in prison. McQuistion now appeals raising three assignments of error for our review:

> I. The trial court erred when it failed to reduce count 2 to a misdemeanor domestic violence offense at the close of the state of Ohio's case in chief.

II. The trial court plainly erred when it permitted evidence of the fact of Mr. McQuistion's prior domestic violence conviction to be admitted and when it also permitted evidence of details of the offense conduct underlying that conviction.

III. Mr. McQuistion received the ineffective assistance of counsel.

## II. Trial Testimony

### A. V.B.

{¶ 5} V.B. testified that she met McQuistion "online through friends" and they started dating in 2022. In September 2022, V.B. and McQuistion moved into an apartment in Brook Park together. V.B. and McQuistion broke up on October 15, 2022, and McQuistion moved out. At the time, V.B. was still living in the apartment, but she could not afford the rent on her own. McQuistion agreed to pay the rent for November 2022, and it was V.B.'s plan to move out of the apartment at the end of the month.

{¶ 6} On November 22, 2022, McQuistion arrived to pick V.B. up from a friend's house after he got off work at 11:00 a.m. However, he did not have the rent money with him. According to V.B., "He said he was going to go get his rent money, and I said okay, and he left to go get his rent money. Then he came back and got me and we went to go get — to go pay the rent." V.B. testified about what happened next. "He paid the rent and I went to walk back to my apartment and he followed me to the apartment, and I turned around and told him he had to go because I had to go to Walmart to pick up my meds." According to V.B., McQuistion "hit me in the head three to four times and I fell backwards into my bed, and then he got on top of me and pulled my pants down and my panties down . . . and he put his private in my

private." V.B. clarified that McQuistion put his penis in her vagina. V.B.'s testimony continued.

> When he stopped he pulled his pants up and went out the door, and then he came back in the door, and I said, I have to go to Walmart. He said, I'll take you, and I said, Okay. And I went with him to Walmart. And when he took me to Walmart I told him, Don't wait for me . . . because I wanted to get away from him. I was scared. . . . I went to Walmart because I knew it was a public place.

{¶ 7} Asked if she felt like she could get away from McQuistion if she stayed in the apartment, V.B. answered, "No." Asked why not, V.B. answered, "I didn't know if he would leave or not." According to V.B., she left Walmart and walked back to the apartment complex, but she stayed outside. V.B. called her sister and then went to the hospital where a rape-kit examination was performed. According to V.B., she spent one more night at the apartment and then she moved her belongings out and never went back.

{¶ 8} V.B. testified that the sex between her and McQuistion was not consensual. "I didn't want it. I didn't want it to happen." Asked how McQuistion knew that V.B. did not agree to the sex, V.B. testified, "Because I told him he had to leave, and he knew we wasn't together."

{¶ 9} On cross-examination, V.B. stated that she has several mental-health issues including schizoaffective disorder, depression, and anxiety. V.B. stated that she takes medication for these issues. V.B. testified that she had never been scared of McQuistion, and he never did anything to hurt her prior to the date of the offense in question. V.B. further testified that, after she and McQuistion moved in together,

she learned from McQuistion's mom that he had "a past of violence . . . ." According to V.B., McQuistion had "slammed on his brakes with me and his mom in the car before. He sped up in the car before. He's done a lot of stuff before."

{¶ 10} V.B.'s testimony on cross-examination went into more detail about how McQuistion knew that V.B. did not consent to having sex with him on the day in question.

> Q: You're telling this court that you've had sex with him over 100 times but at this time you didn't want to have sex with him?
>
> A: Right.
>
> Q: Why not?
>
> A: Because we was not together.
>
> Q: Because you were not together?
>
> A: Yes.
>
> Q: Okay. And it's my understanding before he moved in with you you guys had sex, didn't you?
>
> A: Yes. We were dating.
>
> Q: Oh, okay. Okay.
>
> A: We were not dating so we were not together, and if I'm not dating you I don't have sex with you.
>
> Q: Oh.
>
> A: And that's that.

{¶ 11} Asked to explain why she did not scream, run away, or call the police after McQuistion raped her, V.B. testified that she was scared. "I didn't do anything. I was too scared to do anything yet." V.B. got into the car with McQuistion and went

to Walmart because she "was scared of what he would do. . . . I thought I needed to get in his car so I could be safe because I didn't know what he would have done if I didn't." V.B testified as follows about what happened when they got to Walmart: "I got out of his car, went into Walmart and went to the pharmacy, seen that it was closed, and I went right back out, and I went right back home and went to the hospital." According to V.B., she never saw McQuistion again.

{¶ 12} V.B. testified that she filed a police report against McQuistion twice in 2022 for pushing her. "He would just like push like, . . . shove . . ., but not like hurt . . . . Like he did not hit. He just like pushed."

**B. Danielle Semon**

{¶ 13} Danielle Semon ("Semon") testified that she is a sexual-assault nurse examiner at Southwest General Healthcare Center. Semon conducted V.B.'s forensic examination on November 22, 2022. Semon's testimony, along with V.B.'s medical records admitted into evidence, establish that McQuistion's DNA was found in semen swabbed from V.B.'s vagina. Semon further testified that V.B. "seemed very nervous, very restless, very sad. She didn't really maintain a lot of eye contact. She was tearful at times." Semon testified as follows about V.B.'s injuries: "In this examination she had been complaining of injury to her face. I noticed some redness on the right side of her cheek and her face and the upper part of her head. I'd have to — her arms, there was bruising on her arms and her inner thighs . . . . She was complaining of some tenderness to her upper back." Semon testified that V.B. said "she was hit in the face numerous times."

{¶ 14} On cross-examination, Semon testified that it was "possible" V.B. could have had the bruises before the incident at issue in this case.

### C. Jennifer Phelps

{¶ 15} Jennifer Phelps ("Phelps") testified that she is V.B.'s stepsister and has known V.B. for almost 40 years. V.B. called Phelps "right around 3:45" on November 22, 2022, and V.B. was "very upset. . . . She was crying. She was not her normal, happy self. She was like distraught I guess I could say, crying, not sure what to do. Calling me asking me for help." According to Phelps, she learned that V.B. "had been attacked. . . . She said [McQuistion] attacked her." Phelps told V.B. to call the police. Phelps later learned that V.B. went to the hospital and the police were contacted.

{¶ 16} According to Phelps, she took V.B. back to the apartment "a couple times" after that. "There were times she picked stuff up, there times where I dropped her off to stay."

### D. McQuistion

{¶ 17} McQuistion testified that he met V.B. through an online-dating website called Tagged in 2020. McQuistion and V.B. moved in together in September 2022. McQuistion testified that he and V.B. lived together only "[a]bout like a month and a half" before he moved out. According to McQuistion, V.B. never filed a police report against him, and he "[n]ever punched her, hit her, nothing."

{¶ 18} In November 2022, McQuistion received a call or text from V.B. "[s]aying she was pregnant." On November 22, 2022, V.B. asked McQuistion to

"come and pay the rent." McQuistion picked up V.B. after he got off work that day, and his plan was to "make amends, and pay the rent. I thought I was back together with her." According to McQuistion, he wanted to get back together with V.B. McQuistion testified that after he picked V.B. up, he and V.B. went to the apartment and had consensual sex. Then they went to pay the rent, and McQuistion realized he forgot his debit card. McQuistion needed to go back to his mother's house to get his debit card, and he asked V.B. if she wanted to go with him. V.B. said, "Yes."

{¶ 19} McQuistion paid the rent, and he and V.B. went to the apartment and had consensual sex again. According to McQuistion, he and V.B. "had sex twice that day. . . . We had sex before I paid the rent and after I paid the rent." McQuistion testified that he "never" raped V.B. and he "never" struck V.B. that day. According to McQuistion, after he and V.B. had sex for the second time that day, he asked V.B. if she still wanted to go to Walmart, and V.B. replied, "Yes." McQuistion dropped V.B. off at Walmart, and V.B. said to him, "Let me get a kiss." McQuistion then went back to his mother's house. According to McQuistion, a "day later they arrested me at my job. I was shocked."

{¶ 20} McQuistion testified that he thought V.B. falsely accused him of rape because a domestic-violence situation "breaks the lease [on the apartment] in Ohio. She put that on Facebook." According to McQuistion, V.B. is "mental" and "in and out of the psych ward." McQuistion knew this because he took her to the "mental hospital . . . seven or eight times" during the time that he knew her.

{¶ 21} On cross-examination, McQuistion testified that he had "one domestic violence case before this in 2018." McQuistion further testified that he punched the 2018 victim in the face once, and she had to get stitches. According to McQuistion, this victim "robbed him in the middle of the night." He admitted that what he did was wrong, but he was "so mad [he] hit her." McQuistion's counsel objected, stating that "I think we ought to ask what he pled to." The court sustained this objection. The prosecutor asked McQuistion what he pled to, and McQuistion answered, "Domestic violence."

### III. Law and Analysis

#### A. Crim.R. 29(A) Motion for Acquittal — Evidence of Prior Conviction

{¶ 22} McQuistion's first and second assignments of error will be addressed together because they are interrelated. McQuistion argues that the court should have granted his Crim.R. 29 motion for acquittal on the furthermore clause of the domestic violence offense after the State rested. McQuistion further argues that the court erred by permitting evidence of his prior domestic violence conviction to be admitted at trial.

{¶ 23} First, we note that the court granted McQuistion's Crim.R. 29 motion for acquittal on the furthermore clause of the domestic-violence offense after the defense rested. McQuistion's argument on appeal, and therefore, our analysis, focuses on whether the court erred by not granting the Crim.R. 29 motion for acquittal at the close of the State's case. In essence, McQuistion argues that he was

"prejudiced by evidence of prior violent acts that have nothing to do with the instant charges."

{¶ 24} Crim.R. 29(A)[1] provides that a court "shall order the entry of the judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses." A Crim.R. 29 motion questions the sufficiency of the evidence, and we apply the same standard of review to a trial court's ruling on a Crim.R. 29 motion as we do in reviewing challenges to the sufficiency of the evidence presented at trial. *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.).

{¶ 25} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed," would convince the average mind of defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "In

---

[1] Courts recognize that the significance of a Crim.R. 29 motion for acquittal in a bench trial is different than the significance of the same motion in a jury trial. The Ohio Supreme Court has held the following regarding Crim.R. 29 motions during a bench trial: "The purpose of a motion for judgment of acquittal is to test the sufficiency of the evidence and, where the evidence is insufficient, to take the case away from the jury. In the non-jury trial, however, the defendant's plea of not guilty serves as a motion for judgment of acquittal, and obviates the necessity of renewing a Crim.R. 29 motion at the close of all the evidence." *Dayton v. Rogers*, 60 Ohio St.2d 162, 163 (1979) (*overruled on other grounds*).

essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 26} Crim.R. 52(A), which governs harmless errors, states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." The Ohio Supreme Court has held that "[u]nder the harmless-error standard of review, the state always bears the burden of demonstrating that the error did not affect the outcome of the trial-court proceedings." *State v. Jones*, 2020-Ohio-3051, ¶ 3.

{¶ 27} McQuistion was convicted of misdemeanor domestic violence in violation of R.C. 2919.25(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(D)(3) states in part that "if the offender previously has pleaded guilty to or been convicted of domestic violence, . . . a violation of division (A) . . . of this section is a felony of the fourth degree . . . ." As stated earlier, McQuistion was indicted with, although not convicted of, this "furthermore clause."

{¶ 28} R.C. 2945.75(B)(1) concerns what evidence is sufficient to show a prior conviction, and it states as follows: "Whenever in any case it is necessary to prove a prior conviction, a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction." In *State v. Gwen*, 2012-Ohio-5046, ¶ 14, the Ohio Supreme Court held that

"R.C. 2945.75(B)(1) sets forth one way to provide 'sufficient' proof of a prior conviction, but does not provide the *only* method to prove it. For example, an offender may, and often does, stipulate to a prior conviction to avoid the evidence being presented before a jury." (Emphasis in original.)

{¶ 29} In the case at hand, McQuistion testified that he had a prior domestic-violence conviction and then described that he punched the victim in the face. Assuming without deciding that this evidence was improperly admitted at trial, we find no resulting prejudice to McQuistion. This court has consistently held that "[a]s the trier of fact, the judge is presumed to disregard any prejudicial testimony when making a decision." *State v. Dyer*, 2007-Ohio-1704, ¶ 21 (8th Dist.). *See also State v. Shropshire*, 2016-Ohio-7224, ¶ 37 (8th Dist.) ("In an appeal from a bench trial, we presume that a trial court relies only on relevant, material, and competent evidence in arriving at its judgment.").

{¶ 30} We turn to whether the State presented "relevant, material, and competent evidence in arriving at its judgment." In other words, was there sufficient evidence to convict McQuistion of forcible rape and misdemeanor-domestic violence, without considering his admission that he had a previous domestic violence conviction?

{¶ 31} Misdemeanor domestic violence was previously defined in this opinion as "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(A). "Family or household member" is defined in part as "a person . . . who . . . has cohabitated with the offender within

five years prior to the date of the alleged commission of the act in question."
R.C. 2919.25(F)(2). As to forcible rape, R.C. 2907.02(A)(2) defines the offense as
follows: "No person shall engage in sexual conduct with another when the offender
purposely compels the other person to submit by force or threat of force." Force is
defined in R.C. 2901.01(A)(1) as "any violence, compulsion, or constraint physically
exerted by any means upon or against a person or thing."

{¶ 32} At McQuistion's trial, V.B. testified that she and McQuistion were
dating and living together from September to October 2022. The event underlying
the offenses in this case took place on November 22, 2022. V.B. testified that
McQuistion hit her in the head "three to four times," she fell back on the bed, and
McQuistion got on top of her, pulled her pants and underwear down, and raped her.

{¶ 33} V.B.'s testimony was corroborated by Semon, who testified that V.B.
was visibly upset during the rape-kit examination, V.B. said she was hit in the face,
and V.B. had bruising and soreness on her fact and body. Furthermore,
McQuistion's DNA was found in semen swabbed from V.B.'s vagina. V.B.'s
testimony was also corroborated by Phelps, who testified that V.B. was distraught
and crying. Furthermore, V.B. told Phelps that McQuistion attacked her.

{¶ 34} Upon review, we find sufficient evidence in the record to support
McQuistion's convictions for forcible rape and misdemeanor domestic violence. *See*
*State v. Roan*, 2020-Ohio-5179, ¶ 21 ("Ohio courts have consistently held that a
victim's testimony alone is sufficient to support a rape conviction."); *State v. Whitt*,
2003-Ohio-5934, ¶ 22 (8th Dist.) ("[T]estimony that [the defendant] removed [the

victim's] dress and panties without her consent is sufficient evidence of force or threat of force.").

{¶ 35} Because there is sufficient evidence in the record to support McQuistion's convictions, notwithstanding his admission of a prior domestic-violence conviction, we cannot say that the court erred by permitting the admission of this evidence and declining to grant partial acquittal after the State's case in chief. Accordingly, McQuistion's first and second assignments of error are overruled.

## B. Ineffective Assistance of Counsel

{¶ 36} To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668 (1984). However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697. *See also State v. Bradley*, 42 Ohio St.3d 136 (1989). "To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Conway*, 2006-Ohio-2815, ¶ 95.

{¶ 37} McQuistion argues that his trial counsel was ineffective based on the same two arguments he set forth in his first and second assignments of error — that his counsel was ineffective for inadequately arguing his Crim.R. 29 motion at the

end of the State's case in chief and failing to object[2] to his testimony regarding his prior conviction. We overruled both assignments of error and found that McQuistion was not prejudiced at trial. Therefore, McQuistion has failed to show prejudice in the context of his counsel's effectiveness.

{¶ 38} Accordingly, McQuiston's third and final assignment of error is overruled.

{¶ 39} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR

---

[2] Defense counsel did object to this line of testimony, and the court sustained the objection, although the proverbial bell had been rung at that point.