[Cite as *State v. Angelen*, 2025-Ohio-1453.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

                                         No. 114181

    v.                                  :

JAMARI ANGELEN,                          :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
               AND REMANDED
**RELEASED AND JOURNALIZED:** April 24, 2025

---

Criminal Appeal from the Cuyahoga County Common Pleas Court
Case No. CR-24-689397-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John D. R-R. Kirkland, Assistant Prosecuting Attorney, *for appellee.*

Russell S. Bensing, *for appellant.*

ANITA LASTER MAYS, J.:

{¶1} Defendant-appellant Jamari Angelen ("Angelen") appeals his aggravated murder conviction and sentence and asks this court to vacate his conviction and sentences. We affirm Angelen's conviction. However, we reverse

his sentences and remand to the trial court for resentencing in accordance with this opinion.

{¶2} Angelen was found guilty of one count of aggravated murder, a violation of R.C. 2903.01(A); three counts of murder, violations of R.C. 2903.02(A) and (B); two counts of felonious assault, violations of R.C. 2903.11(A)(1) and (2); and two counts of aggravated robbery, in violation of R.C. 2903.11(A)(1) and (2). One- and three-year firearm specifications were attached to all counts.

{¶3} Before trial, the State dismissed two counts of having weapons while under disability. During trial, after the State rested its case, the trial court granted Angelen's Crim.R. 29 motion for acquittal on two counts of aggravated robbery, two counts of felonious assault, and one count of aggravated theft.

{¶4} After the finding of guilt by the jury, on the aggravated murder count, the trial court sentenced Angelen to life imprisonment with eligibility of parole after 25 years and three years on the firearm specification to be served consecutively. On the remaining counts, the trial court sentenced Angelen to eight years' imprisonment for each count to be served concurrently to each other and to the aggravated murder sentence. The trial court also sentenced Angelen to an additional three years for the firearm specification on one of the aggravated robbery counts to be served consecutively to the firearm specification and life sentence associated with the aggravated murder, for a total sentence of life imprisonment with parole eligibility after 31 years.

I.    Facts and Procedural History

{¶5} On May 25, 2023, David McCray ("McCray") was shot and killed at a car wash while in his vehicle. Police obtained surveillance video from the scene and observed two men at the scene who ran up to McCray and shot him. One of the men exited a white Ford Fusion and was wearing all black, had a gun with an extended magazine, and was heavy set. Tr. 309. The other man was wearing a blue Covid mask, Adidas black and white sweatpants, and red and white Jordan sneakers and had a smaller frame then the first man. He also had an extended gun magazine. Tr. 310 and 358. Both men fled the scene in the Ford. After arriving at the scene, police recovered a gun belonging to McCray. Tr. 311. They also found and collected several bullet casings and observed where bullets had struck areas around the car wash as well as McCray's vehicle. Tr. 327-328.

{¶6} The manager of the car wash told police that he heard gunshots while outside of the car wash. Tr. 350. When he looked to see where the shots were coming from, he noticed a person shooting and then getting into a white Ford Fusion, and the car driving off. The person he observed matched the description of the heavier set man wearing all black. The surveillance videos taken from the scene confirm the manager's account of the event. The videos also show a white Jeep Cherokee, with the license plate HHL4513 pulling into the vacuum line. Tr. 357. McCray's vehicle pulled in next to the Jeep a few seconds later, and the Jeep leaves four minutes later. Tr. 358. One of the men, later identified as Angelen, exited the Jeep. Tr. 359. Eight minutes later, the white Ford Fusion

entered the line. *Id.* Angelen and the other man from the Ford shot McCray. Tr. 360.

{¶7} On May 26, 2023, the next day, police located the Jeep from the car wash and started a pursuit but had to terminate. They located the vehicle, again, and engaged in pursuit, but lost visual of the Jeep. Tr. 331. That same evening, a witness, while sitting in his car, observed the Jeep pulling next to him in a parking lot. Tr. 373. Four men jumped out of the Jeep and started wiping the handles of the doors and then ran away. *Id.* The witness described four young men with braids with hoods on their heads. Tr. 374.

{¶8} The police entered both the Jeep and Ford into their computer system as felony vehicles to alert other officers that these vehicles were wanted in connection with a homicide. Tr. 1156. The Jeep and the Ford license plates were matches to other cars, so the police deemed them "fictitious" plates, because both vehicles were stolen. *Id.* The Ford was later located in a field and had been damaged by fire. Tr. 1158. The police recovered gun casings from the windshield area and logged them into evidence. The police also recovered a Five Guys restaurant receipt that was dated May 25, 2023, and one hour before the murder took place.

{¶9} The police retrieved the surveillance video from Five Guys of their parking lot to observe the time frame from the receipt. Tr. 1186. On the video, the police observed the Ford pulling into the parking lot. They identified the man exiting the Ford as Frank Goodwin ("Goodwin"). Goodwin was dressed in the

same shoes and clothes as the driver of the Ford seen on the car wash surveillance video. Tr. 1188.

{¶10} Once Goodwin was identified, the police searched for Goodwin's Instagram account to see if he posted anything related to the incident. Tr. 463. The police found a picture of Goodwin, Markeise Billups ("Billups"), and Angelen. Tr. 466. Goodwin's Instagram account led police to Billups, Angelen, and a fourth suspect, Stafonze Robinson ("Robinson"). Tr. 1263. Upon further investigation, the police discovered that Goodwin, Billups, Angelen, and Robinson were connected to a robbery and shooting that occurred in the City of Euclid on May 5, 2023. Tr. 1116. The men discussed the robbery and what they stole in a group chat on Instagram. Tr. 1241. Goodwin, Billups, and Angelen's cell phones were also in the area of the robbery at the same time, during the time of the robbery. Tr. 1283.

{¶11} The Instagram accounts also led the police to the cell phone numbers of the men. Cell phone records demonstrated that all four men were at the car wash on the day of the murder. Tr. 1120. Additionally, photos posted on Instagram of Angelen showed him wearing clothing that matched the second man in the surveillance video at the car wash. Tr. 1257.

{¶12} The police also reviewed license plate readers at intersections to see if they could create a timeline of the Jeep's and Ford's movements leading up to and after the murder. They were able to observe the Jeep at a liquor store prior to the first police pursuit. Tr. 1196. After creating a timeline, they requested timing

advance records from T-Mobile to analyze the cell phone data associated with the locations of the Jeep. Tr. 1197. After conducting the analysis of the timing advance records, the police were able to connect the cell phone number belonging to Angelen, which was confirmed from Angelen's Instagram account to the car wash location. From this, the police were able to determine that Angelen's cell phone was at the car wash at the time of the shooting. Tr. 1273. Cell phone records also placed Angelen's cell phone at the location of the abandoned and burned Ford. Tr. 1285.

{¶13} Angelen's Instagram account also contained a live-streamed video with Angelen and Billups seated in the white Jeep close to the time of McCray's murder, right before it pulled into the car wash. Angelen is seen on the Instagram video wearing an outfit and accessories identical to what the man was wearing on the car wash surveillance video. Tr. 1256-1258. Also in the Instagram video was a drum magazine to a firearm that was identical to the magazine observed in the car wash surveillance video. Tr. 1260.

{¶14} During the course of the investigation, the police obtained warrants for Billups, Goodwin, Angelen, and Robinson's DNA. Angelen's DNA was matched to the DNA on the front passenger interior door handle of the Jeep. Tr. 644. They also matched the gun casings found in the abandoned Ford to the gun casings left at the scene of the robbery in Euclid. Tr. 1291. After conducting a search at Goodwin's residence, they recovered the black-hooded jacket and the shoes Goodwin wore when he exited the Ford to shoot McCray. Tr. 1293-1295.

**{¶15}** On July 5, 2023, Goodwin was charged for the robbery in Euclid and the murder of McCray. On August 28, 2023, the State added Angelen, Robinson, and Billups as codefendants. On February 23, 2024, Goodwin, Angelen, and Billups were reindicted with additional charges from the robbery and shooting in Euclid. On June 10, 2024, Goodwin pleaded guilty to amended charges and was sentenced to life imprisonment with parole eligibility after 21 years. On June 11, 2024, Billups pleaded guilty to amended charges and was sentenced to 15 to 19 years' imprisonment. On August 7, 2024, Robinson pleaded guilty to felonious assault and was sentenced to six to seven and a half years' imprisonment.

**{¶16}** Angelen elected to have a trial after rejecting a plea offer by the State. Tr. 40. On June 10, 2024, Angelen's trial commenced. The State called 29 witnesses, and at the end of State's case, Angelen moved the court for an acquittal under Crim.R. 29. Tr. 1389. The trial court denied Angelen's motion pertaining to the McCray's murder but dismissed the counts pertaining to the robbery in Euclid that occurred on May 5, 2023. Angelen did not call any witnesses or enter any evidence into the record. On June 21, 2024, the jury unanimously found Angelen guilty of all eight charges.

**{¶17}** On June 24, 2024, at the sentencing hearing, Angelen spoke to McCray's family before the trial court sentenced him. He stated: "I would like to say I apologize. That Detective right there, he been lying to ya'll. We did not purposely wake up meaning to kill him. It was not planned like that. I am sorry. Everybody can feel how you feel against me." Tr. 1523.

**{¶18}** Before proceeding with sentencing Angelen, the trial court stated:

What drives me to something more than the minimum, because you deserve more than the minimum, is because you're not only sitting in the jeep, but you got into that Fusion, and you're the guy who takes the first step, with the gun drawn, pointed at him, as you sneak up on him at the side of the door.

I play that slowly through my head, watch exactly what you did, and that movement, and the grabbing of his arm allows Mr. Goodwin to fire the first shot, in my eyes, I believe, but you take a step back and unload your gun on him, as well.

You took his life, a senseless taking of his life.

Tr. 1529-1530.

**{¶19}** The trial court proceeded to sentencing Angelen, stating:

In looking at the case before me, and the charges before me on Count 1, you do have to be sentenced to six years on the gun specs.

So regarding Count 1, the three-year gun spec will be run consecutive to the three-year gun spec in Count — I'm going to run it consecutive in the robbery charge, the aggravated robbery.

So Count 7's three-year gun spec will be run consecutive to Count 1's three-year gun spec. All other gun specs will be run concurrent.

So you have six years that have to be served first, no credit. I know you have 348 days credit, but that credit does not count.

You serve the six-year gun spec first, and then you serve a life sentence. And your eligibility at parole will be at 25 years.

So you serve 25 years. The Parole Authority makes a determination of whether you're someone eligible to be released on parole, and you will be on parole for life, so any violation of parole could send you back for the remaining time.

I think the statistical guideline that I see is that you never get parole on your first time that you go before the Parole Authority, but I don't make those determinations.

So your term will be six years, gun spec, and then life in prison, with Parole Authority after 25 years.

What does count towards those 25 years is 348 days of credit, plus any time while you await your transportation to Lorain Correctional Institution and the final destination of where you'll be sentenced to.

I'll waive your fines, fees, and Court costs because of your indigency. I'll ask that there be no contact with the family in any way of Mr. McCray regarding this matter as well.

All other counts will be run concurrent. On all other counts, all of them being felonies, unspecified felonies, as well as felonies of the second and first degree, on all of those charges, it will be an eight-year term of incarceration on Counts 2 through 8.

All those times to be run concurrent to the life sentence, as well, other than the three-year gun spec on Count 7, which, again, will be run concurrent — or, excuse me, consecutive.

Tr. 1530-1532.

{¶20} Angelen filed this appeal assigning two errors for our review:

1.   The trial court erred in entering a conviction of aggravated murder which was based upon insufficient evidence, in derogation of defendant's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 16 of the Ohio Constitution; and

2.   The trial court committed plain error in failing to merge offenses which were allied, in derogation of defendant's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 16 of the Ohio Constitution.

## II.   Sufficiency of the Evidence

### A.   Standard of Review

**{¶21}** "'[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed,' would convince the average mind of defendant's guilt beyond a reasonable doubt.'" *State v. McQuisition*, 2024-Ohio-3011, ¶ 25 (8th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 (1991). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *id.* at paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

**{¶22}** Further,

> [i]n reviewing whether evidence is sufficient to establish the prior-calculation-and-design element of aggravated murder, a court must consider whether the evidence, when viewed in the light most favorable to the prosecution, supports a finding that a defendant acted with advance reasoning and purpose to kill.

*State v. Jones*, 2021-Ohio-3311, ¶ 2.

## B.    Law and Analysis

**{¶23}** In Angelen's first assignment of error, he argues that the evidence is not sufficient to convict him of aggravated murder because the State failed to prove he caused McCray's death with prior calculation and design that is necessary to sustain a conviction for aggravated murder.

**{¶24}** R.C. 2903.01(A) states, in pertinent part: "No person shall purposely, and with prior calculation and design, cause the death of another. . . ." "Prior calculation and design has been defined by Ohio courts as the presence of sufficient time and opportunity for the planning of an act of homicide." (Cleaned up.) *State v. Hughley*, 2020-Ohio-4741, ¶ 36 (8th Dist.). "The finding of prior calculation and design turns upon the particular facts and evidence presented at trial and must be determined on a case-by-case basis." (Cleaned up.) *Id.*

**{¶25}** "Prior calculation and design has been interpreted to mean more than a momentary deliberation; it requires a scheme designed to implement the calculated decision to kill." (Cleaned up.) *State v. Smith*, 2021-Ohio-1185, ¶ 9 (8th Dist.). "While neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, momentary [or immediate] deliberation is insufficient." (Cleaned up.) *Id.*

**{¶26}** "Thus,

> [t]he state can prove 'prior calculation and design' from the circumstances surrounding a murder in several ways, including: (1) 'evidence of a preconceived plan leading up to the murder'; (2) 'evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded' or (3) 'evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill,' such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr*, 2014-Ohio-4680, ¶ 75 (8th Dist.), citing *State v. Dunford*, 2010-Ohio-1272, ¶ 53 (11th Dist.); *State v. Trewartha*, 2005-Ohio-5697, (10th Dist.); *State v. Hough*, 2010-Ohio-2770, ¶ 19 (8th Dist.) ('[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design.')."

*State v. Maxey*, 2024-Ohio-1279, ¶ 40 (8th Dist.), quoting *State v. Hicks*, 2015-Ohio-4978, ¶ 40 (8th Dist.).

**{¶27}** "'There is no bright-line test for determining the presence or absence of prior calculation and design; however, the Ohio Supreme Court has identified several factors to be weighed along with the totality of the circumstances surrounding the murder in determining the existence of prior calculation and design.'" *Id.* at ¶ 41, quoting *id.* at ¶ 41. The following factors are to be taken into consideration: "'whether the defendant and the victim knew each other and, if so, whether the relationship was strained; whether there was thought or preparation in choosing the murder weapon or murder site; and whether the act was drawn out or an almost instantaneous eruption of events.'" *Id.*, quoting *id.*, citing *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997).

**{¶28}** The record does not reflect that Angelen and McCray knew each other. However, the analysis of whether there is prior calculation and design will be determined by the other two factors. When Angelen approached McCray, he had his gun drawn and immediately pointed it at McCray. "[M]ere possession of a firearm is not enough to establish prior calculation and design," but Angelen was not just in possession of the gun. *Jones*, 2021-Ohio-3311 at ¶ 24. After a call was placed from the Jeep to Goodwin, Angelen waited at the car wash for Goodwin, and then they both ambushed McCray with their guns drawn, firing 15 rounds. Tr. 580-591. Essentially, Angelen and his codefendants chose the location of the

homicide and came armed with handguns, including the gun with the drum magazine.

{¶29} The act of murdering McCray was not an almost instantaneous eruption of events. The Supreme Court has consistently held that "a defendant can conceive and execute a plan to kill, even if formulated within a few minutes 'when there is evidence that the defendant's actions went beyond a momentary impulse and show that he was determined to complete a course of action.'" *State v. Claytor*, 2022-Ohio-1938, ¶ 57 (8th Dist.), quoting *Jones* at ¶ 26.

{¶30} The surveillance video shows McCray standing outside of the vehicle, leaning in the driver's side, vacuuming inside of his vehicle. His back is to the outside, when Angelen and Goodwin jump out of the Ford Focus, making no attempt to rob him, but instead pushing him down and immediately start shooting him. As McCray fell to the ground, he tried to grab his gun from his waistband in self-defense but was unable to retrieve it fast enough. As he lay dying, McCray shot his gun under his car, resulting in two shell casings under his vehicle. McCray did not shoot at Angelen and Goodwin first. There is no evidence from the video that this was simply a robbery gone bad. It shows the two men carrying out a surprise attack on McCray. After returning to the Ford and getting in, they continue to shoot McCray as he lay on the ground. Additionally, the video shows that when the Ford Focus arrived at the car wash, it drove past McCray and made a U-turn. However, upon making the U-turn, the Ford was delayed twice from pulling behind McCray because two different vehicles pulled out in front of the Ford.

**{¶31}** In this case, considering these factors along with the totality of the circumstances surrounding McCray's murder, we find that, after construing the evidence presented at trial (including all reasonable inferences that could be drawn from that evidence) in the light most favorable to the State, there was sufficient evidence to establish beyond a reasonable doubt that Angelen acted with prior calculation and design in murdering McCray. This was not a sudden eruption of events, but rather a situation where Angelen arrived at the car wash, ambushed McCray, and repeatedly shot him.

**{¶32}** "This does not mean that the evidence precludes any other inferences. But on a sufficiency review, the evidence need not satisfy so high a burden." *Jones* at ¶ 27. The Ohio Supreme Court has held that "'[w]here reasonable minds can reach different conclusions upon conflicting evidence, determination as to what occurred is a question for the trier of fact. It is not the function of an appellate court to substitute its judgment for that of the factfinder.'" *Id.*, quoting *Jenks*, 61 Ohio St.3d at 279.

**{¶33}** We cannot conduct our own assessment of the evidence and draw the inferences we found most persuasive, rather than crediting the State's evidence and drawing all reasonable inferences in the State's favor. *Id.* "Such an analysis is more like a manifest-weight review than a sufficiency analysis." *Id.*, citing *State v. Wilson*, 2007-Ohio-2202, ¶ 25.

**{¶34}** Therefore, Angelen's first assignment of error is overruled.

## III. Sentence Contrary to Law

## A. Standard of Review

{¶35} "When reviewing felony sentences, this court no longer applies an abuse of discretion standard. We review felony sentences under the standard set forth in R.C. 2953.08(G)(2)." *State v. Hess*, 2021-Ohio-579, ¶ 10 (8th Dist.), citing *State v. Marcum*, 2016-Ohio-1002, ¶ 1, 21. R.C. 2953.08(G)(2) provides that when reviewing felony sentences, the appellate "shall review the record, including the findings underlying the sentence . . . given by the sentencing court" and that it "may increase, reduce, or otherwise modify a sentence . . . or may vacate the sentence and remand the matter to the sentencing court for resentencing" if it "clearly and convincingly finds" that (1) "the record does not support the sentencing court's findings" under particular statutory provisions that do not apply here or (2) "the sentence is otherwise contrary to law." "A sentence is contrary to law if the trial court fails to comply with sentencing statutes." *State v. Johnson*, 2022-Ohio-1948, ¶ 6 (8th Dist.), citing *State v. Holmes*, 2014-Ohio-603, ¶ 10 (8th Dist.).

{¶36} "We review an allied offense claim de novo." *State v. Head*, 2023-Ohio-1364, ¶ 32 (8th Dist.), citing *State v. Williams*, 2019-Ohio-794, ¶44 (8th Dist.); R.C. 2941.25.

## B. Law and Analysis

{¶37} In Angelen's second assignment of error, he argues that the trial court erred when it failed to merge allied offenses. The State concedes this error, in part. Angelen contends that the three convictions for murder have a prescribed sentence

of life imprisonment with the possibility of parole after 15 years. The trial court sentenced Angelen to eight years for each count of murder. This portion of the sentence in and of itself is contrary to law. According to R.C. 2929.02(B)(1), "whoever is convicted of or pleads guilty to murder . . . shall be imprisoned for an indefinite term of fifteen years to life." Angelen also argues that all other offenses should have merged into the aggravated murder offense.

{¶38} The State, however, concedes that the three murder counts should merge with each other and into count one, aggravated murder. However, the State argues that the two counts of aggravated robbery should merge with each other, but not with the aggravated murder count.

{¶39} Instead, the trial court sentenced Angelen on each count separately but then ran each sentence concurrently to one another.

{¶40} The State concedes that aggravated murder and murder are allied offenses. *See State v. Williams*, 2016-Ohio-7658, ¶ 14. The State also concedes that the aggravated robbery offenses should merge with each other. Although the trial court ran the sentences for each concurrently, the imposition of concurrent sentences is not the equivalent of merging allied offenses. *Id.* at ¶ 3, citing *State v. Damron*, 2011-Ohio-2268, ¶ 17. "'[A] trial court is prohibited from imposing individual sentences for counts that constitute allied offenses of similar import.'" *Id.* at ¶ 27, quoting *State v. Underwood*, 2010-Ohio-1, ¶ 26. "We characterized the sentencing court's duty to merge allied offenses as 'mandatory, not discretionary.'" *Id.*, quoting *id.*

**{¶41}** We find that Angelen's argument concerning the merger of the aggravated robbery counts with aggravated murder count is not well taken. Regarding Angelen's claim that the aggravated murder and aggravated robbery counts should have merged, "we note that the Supreme Court of Ohio has held that these two offenses are not allied offenses of similar import." *State v. Hughley*, 2020-Ohio-4741, ¶ 62 (8th Dist.), citing *State v. Coley*, 93 Ohio St.3d 253, 265 (2001); *State v. Bickerstaff*, 10 Ohio St.3d 62, 66 (1984). *See also State v. Philpotts*, 2022-Ohio-2865, ¶ 114 (8th Dist.) (aggravated murder is not an allied offense of similar import to aggravated robbery).

**{¶42}** We remand to the trial court for resentencing because "[w]e have recognized that a resentencing hearing limited to correcting the void sentence is a proper remedy for a trial court's failure to comply with mandatory sentencing laws." *Williams* at ¶ 30, citing *State v. Fischer*, 2010-Ohio-6238, ¶ 29. "And when a case involving an allied offenses sentencing error is remanded for resentencing, the State has the right to elect which offense to pursue at resentencing." *Id.*, citing *State v. Whitfield*, 2010-Ohio-2, ¶ 21.

**{¶43}** Therefore, Angelen's second assignment of error is sustained, in part, and overruled, in part.

**{¶44}** Judgment affirmed in part, reversed in part, and remanded.

It is ordered that appellee and appellant split costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MARY J. BOYLE, P.J., and
MICHAEL JOHN RYAN, J., CONCUR